TRANSBRASIL S.A. LINHAS AEREAS, Petitioner,

v.

DEPARTMENT OF TRANSPORTATION and Federal Aviation Administration, Respondents,

Stewart International Airport, Intervenor.

STERLING AIRWAYS A/S, Petitioner,

v.

DEPARTMENT OF TRANSPORTATION and Federal Aviation Administration, Respondents.

Nos. 85–1031, 85–1106.

United States Court of Appeals, District of Columbia Circuit.

June 3, 1986.

Joanne W. Young, New York City, was on brief, for petitioner in No. 85–1031. Mahlon M. Frankhauser, New York City, also entered an appearance for petitioner in No. 85–1031.

Frederick S. Hird, Jr., Washington, D.C., was on brief, for petitioner in No. 85–1106.

Anne S. Almy, Maria A. Iizuka, Attys., Dept. of Justice and James S. Dillman, Asst. Chief Counsel, F.A.A., Washington, D.C., were on brief, for respondents in Nos. 85–1031 and 85–1106. John A. Bryson, Atty., Dept. of Justice, Washington, D.C., also entered an appearance, for respondents in No. 85–1031. Peter R. Steenland, Jr., Washington, D.C., also entered an appearance, for respondents in No. 85–1106.

Before WALD, MIKVA and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Of late our skies have not been so friendly for foreign carriers, like petitioner[1] Transbrasil S.A. Linhas Aereas ("Transbrasil"), which fly older four-engine aircraft not yet in compliance with Federal Aviation

---

1. Transbrasil's petition for review was consolidated with that of Sterling Airways A/S, whose Hawkins-Chiles exemption contained a similarly calculated limit on its frequency of operations.

Prior to oral argument, Sterling informed this court that it had contracted to sell its noncompliant aircraft and no longer had plans to operate them to the United States. Sterling's peti-

Administration ("FAA") noise standards. Although the FAA granted Transbrasil an exemption from those regulations pursuant to the Hawkins-Chiles Amendment, Pub.L. No. 98–473, § 124, 98 Stat. 1837, 1970–71 (1984), the carrier's intended schedule for flying down to Rio was distinctly curtailed by the restriction that only fourteen flights *a year* would be permitted. We hold that the statutory interpretation on which the FAA grounded this restriction navigates too far afield of the language and legislative history of the Amendment to stay aloft.

## I. Background

In November 1980, pursuant to a directive in the Aviation Safety and Noise Abatement Act of 1979 ("ASNA"), 49 U.S.C. § 2122 (1982), the FAA extended its noise regulations to cover foreign aircraft operating in the United States, generally requiring compliance by January 1985. 45 Fed.Reg. 79,302, 79,303–04 (1980). Most small carriers set out to comply by retrofitting their airplanes with sound absorbing materials or "hush kits," but they encountered turbulence when it became clear that hush kits would not be commercially available in time to meet the deadline. Although the ASNA conference report had indicated that the FAA should grant exemptions from the deadline for foreign carriers in hardship situations, the agency had denied all such exemption requests as of October 1984. *See Airmark Corp. v. FAA*, 758 F.2d 685, 687–88 (D.C.Cir.1985).[2]

Congress therefore decided to issue new flight plans and to co-pilot part of the exemption program itself. The Hawkins-Chiles Amendment required exemptions to be granted for carriers operating out of the Miami, Florida, or Bangor, Maine, airports when specified conditions were met. Pub.L. No. 98–473, § 124, 98 Stat. 1837, 1970–71 (1984).[3] One of those conditions, at issue here, was that

> [n]o person receiving an exemption under the provisions of this section may increase either the *frequency of operations* into the place for which the exemption was granted, or increase the *number* of non-compliant aircraft operated at the place for which the exemption was granted beyond that existing in the twelve months prior to the date of enactment of this section.

*Id.* at § 124(f) (emphasis added).

As of October 12, 1984, when Hawkins-Chiles was enacted, Transbrasil had already petitioned the FAA for an exemption from the noise standards under the agency's general exemption power. On November 30, Transbrasil amended its petition to further request an exemption for its operations at Miami under Hawkins-Chiles. Petitioner's Supplementary Appendix ("S.A.") at 46. The supplementary petition indicated that Transbrasil had begun operations at Miami in August 1984 and thus had conducted only fourteen operations to and from Miami airport between October 12, 1983, and October 11, 1984—five in August, seven in September, and two in the first eleven days of October. *Id.* at 56, 100.[4] In the petition, Transbrasil argued that § 124(f) should not be unreasonably interpreted to limit its exemption to the fourteen flights actually conducted in 1984, and requested the FAA to allow for the average of six operations a month that

---

tion for review in No. 85–1106 is accordingly dismissed as moot.

**2.** For a more complete history of the FAA's noise standard and the accompanying disputes over exemptions for foreign carriers before and after *Airmark*, see *Lineas Aereas del Caribe, S.A. v. Department of Transportation*, 791 F.2d 972, at 974–75 (D.C.Cir.1986); *Capitol Technical Services, Inc. v. FAA*, 791 F.2d 964, at 966–67 (D.C.Cir.1986).

**3.** Section 124 mandated exemptions for carriers operating two types of aircraft: those for which

hush kit contracts had been made with a bona fide supplier and those obtained prior to January 1, 1980, for which no hush kits were under development. Applications for these exemptions had to be submitted by January 1, 1985, and to comply with other requirements specified in the Amendment. 98 Stat. at 1970–71.

**4.** Transbrasil's operations at Miami airport began late and were limited in number because of difficulties in aviation relations between Brazil and the United States. S.A. at 50–51.

Transbrasil had conducted during its three months of service. *Id.* at 56–57.

The FAA denied Transbrasil's exemption request under its general exemption powers but found that the airline qualified for relief under the Hawkins-Chiles Amendment. S.A. at 148. The carrier's hopes for meaningful relief crash-landed, however, because the exemption was limited to fourteen operations, "based on the number of operations conducted by this petitioner at Miami International Airport during the period between October 12, 1983 to October 11, 1984." *Id.* at 152. Transbrasil appeals from this restriction.

## II. ANALYSIS

As always, our review of an agency's statutory interpretation takes off from *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), in which the Court instructed reviewing courts to defer to agencies when an ambiguous statute explicitly or implicitly delegates the task of interpretation to the agency. First, however, the court must assess "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter." *Id.*, 104 S.Ct. at 2781. In this initial inquiry into congressional intent, the court is "not required to grant any particular deference to the agency's parsing of statutory language or its interpretation of legislative history." *Rettig v. Pension Benefit Guaranty Corp.*, 744 F.2d 133, 141 (D.C.Cir.1984). Our examination of the language and history of § 124(f) convinces us that the FAA erred because Congress did not intend "frequency of operations" during the previous one year period to encompass solely the absolute "number" of operations undertaken in that time period. We conclude that the FAA's contrary conclusion misreads Congress' signals.

### A. *Statutory Language*

 The language of § 124(f) is clear: the statute restricts both the frequency of operations and the number of non-compliant aircraft to which the exemption can apply. Transbrasil argues that the terms "frequency" and "number" do not refer to the same concept and that "frequency of operations" describes the average number of flights that Transbrasil conducted during a fixed period of actual operations. We agree that the FAA's contrary interpretation—that "frequency" refers only to the "number" of flights that took place during the "twelve months prior to the date of enactment" of Hawkins-Chiles—is unreasonable.

The FAA's argument that "frequency of operations" means the absolute number of flights during the twelve month period preceding Hawkins-Chiles makes no textual or practical sense. First of all, it accords "frequency of operations" and "number" identical meanings, even though Congress used these two quite different words in the same section. And "[w]here different terms are used in a single piece of legislation, the court must presume that Congress intended the terms to have different meanings." *Wilson v. Turnage*, 750 F.2d 1086, 1091 (D.C.Cir.1984). If Congress had truly meant to tie the exemption to the exact number of flights conducted during the previous year it knew how to do so. Indeed, that is just what Congress did with respect to the number of non-compliant aircraft.

In addition, it seems semantic nonsense for the FAA to calculate the "frequency of operations" during months in which Transbrasil could not or did not operate. Statutory language must be accorded a common sense reading, yet the FAA's interpretation of § 124(f) requires an airline which has been operating six flights a month during its three month period of actual operation to *reduce* its frequency of operations to just over one flight a month as the result of a provision whose purpose is merely a provision to maintain the *status quo* with respect to frequency of operations. The Supreme Court has instructed that "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973

(1982). An alternative interpretation, based on plain meaning, is available here: "frequency of operations" means the average number of flights during a fixed period of actual operation. We now turn to the legislative history to confirm that this interpretation is consistent with Congress' purpose in enacting the Hawkins-Chiles Amendment.

### B. *Legislative History*

What sparse legislative history of the Amendment exists [5] clearly indicates that Congress intended to depart from the FAA's stated policy of not granting exemptions to carriers faced with hardship situations in meeting the January 1985 compliance deadline. This no-exemption policy, in the eyes of a congressional majority, threatened economic harm both to the Miami and Bangor areas, which rely heavily on the international trade conducted by small foreign carriers, and to the carriers and the nations with which they associate in this trade. 130 Cong.Rec. S14,213–14 (daily ed. Oct. 11, 1984); 130 Cong.Rec. S13,009–10, S13,040–44 (daily ed. Oct. 3, 1984). By itself making several of the findings that the ASNA conference report had indicated should govern grants of exemptions, Congress intended to limit the FAA's discretion to deny exemptions. 130 Cong.Rec. S14,213–14 (daily ed. Oct. 11, 1984); 130 Cong.Rec. S13,042 (daily ed. Oct. 3, 1984). Not surprisingly, the FAA and the Department of Transportation were adamantly opposed to this clipping of their discretionary wings. S13,007, S13,044 (daily ed. Oct. 3, 1984).

Although some senators opposed Hawkins-Chiles on the ground that it would weaken enforcement of the noise standards, the primary opposition to the Amendment stemmed from the fear that Miami and Bangor would gain a competitive advantage over other airports because foreign carriers would shift operations to the airports into which they could fly non-compliant aircraft. It was in an attempt to meet this concern that the Amendment's sponsors drafted § 124(f): by forbidding an increase in the frequency of existing service, Miami and Bangor would be prevented from gaining any such competitive advantage. 130 Cong.Rec. S14,214 (daily ed. Oct. 11, 1984); 130 Cong.Rec. S13,007–10, S13,043–45 (daily ed. Oct. 3, 1984).

Thus, nothing in the legislative history contradicts the plain meaning of § 124(f) that the exemption is limited only to the average number of flights conducted by Transbrasil during periods in which it was actually operating. Allowing Transbrasil to make six flights per month under its exemption would in no way accord Miami airport the competitive advantage feared by Hawkins-Chiles opponents, because Transbrasil's "frequency of operations" would remain at pre-Amendment levels. Proponents' concerns with economic hardship to the small carriers and airports are also best addressed by reading the statute to fully allow flights to continue at the prior frequency of operations. We therefore conclude that the FAA erred by limiting Transbrasil's Hawkins-Chiles exemption to fourteen flights.

### III. CONCLUSION

■ The FAA defends its reading of the phrase "frequency of operations" as a contemporaneous interpretation of a statute by the agency charged with implementing the law, deserving of great deference.[6] While such interpretations are usually accorded first class treatment, "an agency's interpretation ... cannot be sustained if, as in this case, it conflicts with the clear language and legislative history of the statute." *Escondido Mutual Water Co. v. La Jolla, Rincon, San Pasqual Pauma, & Pala Bands of Mission Indians,* 466 U.S. 765, 104 S.Ct. 2105, 2114 n. 22, 80 L.Ed.2d 753 (1984). When, as here, a statute's lan-

---

**5.** The exemption provision was an amendment to a lengthy appropriations continuing resolution and was not subjected to hearings, discussed in any of the congressional reports, or debated on the House floor. The legislative history is limited to two days of debate in the Senate.

**6.** Actually, the FAA's most contemporaneous interpretation of the Amendment is contained in the instructions for exemption applications published in the Federal Register on November 6, 1984. The instructions request information on the number of operations conducted monthly during the pertinent twelve month period and

guage and history indicate a clear congressional intent, the court may end its journey and deplane without ever reaching the issue of the extent of deference to be accorded the agency's interpretation. The language and history of the Hawkins-Chiles Amendment clearly establish that Transbrasil is entitled to continue flying at the frequency it maintained during a representative time period of actual operation in the twelve months prior to enactment of the Amendment. The exemption's restriction to fourteen flights is vacated and the case is remanded so that the FAA may impose a restriction on Transbrasil's frequency of operations which is consistent with this opinion. Transbrasil should now be flying high—its petition for review is

*Granted.*

explain that exemptions "are limited to specific airplanes and to the use of those airplanes at certain locations *under specified monthly limits on the number of operations.*" 49 Fed.Reg. 44,-349, 44,350 (1984) (emphasis added). If anything, this contemporaneous interpretation by the FAA seems more consistent with the plain meaning of the Amendment advocated by Transbrasil and adopted by this court than with the stance taken by the agency in restricting Transbrasil's exemption.