Stella PAPPAS, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION, an agency of the United States of America, and the United States of America, Respondents,

Microband Corporation of America, Intervenor.

Stella PAPPAS, Petitioner,

v.

FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents.

Nos. 85–1149, 85–1513.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 5, 1986.

Decided Dec. 19, 1986.

Stephen A. Sharp, with whom Virginia S. Carson and Steven P. Goldman, Washington, D.C., were on the brief for petitioner in Nos. 85–1149 and 85–1513.

Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., with whom Jack D. Smith, Gen. Counsel, Sue Ann Preskill and Tatsu Kondo, Counsel, F.C.C., Robert B. Nicholson and Marion L. Jetton, Dept. of Justice, Washington, D.C., were on the brief for respondents in Nos. 85–1149 and 85–1513.

Stephen R. Bell and Paul J. Sinderbrand, Washington, D.C., entered appearances for intervenor in No. 85–1149.

Before WALD, Chief Judge, and MIKVA, Circuit Judge, and LEIGHTON,* Senior District Judge.

Opinion for the Court filed by Senior District Judge LEIGHTON.

LEIGHTON, Senior District Judge:

These are petitions by Stella Pappas to review two orders of the Federal Communications Commission. First, in the *Second Report and Order*, the Commission decided that the use of a lottery to award multichannel, multipoint distribution service licenses was in the public interest. Second, in the *Third Report and Order*, it declined to award preferences to women in lotteries used to issue mass media licenses. The parties ask that we resolve two issues: first, whether the Commission acted reasonably when it decided that it was in the public interest to award mass media licenses by lotteries; and second, whether the Commission acted properly in refusing to award preferences to women in mass media licensing lotteries. The facts from which these issues arise are not in dispute.

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

## I

A multichannel, multipoint distribution service, hereinafter referred to by the acronym MMDS, is an omnidirectional transmission system used primarily for the distribution of television entertainment programming. It is a common carrier of television distribution that can transmit signals from a single point over several channels and to many points simultaneously; it provides channels for distribution of television signals over metropolitan areas. In 1982, the Federal Communications Commission ("FCC" or the "Commission"), decided to expand the number of MMDS channels available to the public so there could be a wider range of applications. It announced that 1,000 such licenses were to be awarded; by September 9, 1983, it had received approximately 16,000 applications.

This huge number of applications raised a problem with which the Commission had been concerned for some years; that is, a large number of applicants for the number of licenses or permits to be awarded. This problem, a recurring one, led Congress to authorize the Commission, at its discretion, to grant licenses or construction permits to qualified applicants by conducting a lottery instead of initial comparative hearings for mutually exclusive applications.[1] At the time Congress did this, it directed the Commission to:

> establish rules and procedures to ensure that, in the administration of any system of random selection under this subsection, groups or organizations, or members of groups or organizations, which are underrepresented in the ownership of telecommunications facilities or properties will be granted significant preferences. 47 U.S.C. § 309(i)(3)(A) (1981).

The conference report on the bill stated, with regard to the scheme of preferences, that:

It is the firm intention of the conferees that ownership by minorities, such as blacks and hispanics, as well as by women, and ownership by other underrepresented groups, such as labor unions and community organizations, is to be encouraged through the award of significant preferences in any such random selection proceeding. These are groups which are inadequately represented in terms of nationwide telecommunications ownership, and it is the intention of the conferees in establishing a random selection process that the objective of increasing the number of media outlets owned by such persons or groups be met. H.R. Rep. No. 97–208, 97th Cong., 1st Sess. 1, 897 (1981), *reprinted in* 1981 U.S.Code Cong. & Admin.News 396, 1259 ("1981 *Conference Report*").

The Commission, however, had difficulty in interpreting the statute Congress had adopted.[2] The enactment lacked specificity; the establishment of the scheme, the identity of groups eligible for lottery preferences, and the meaning of the term "significant preferences," raised serious obstacles to the Commission's implementation of the lottery procedure described in the statute.[3] As a consequence, the Commission decided it was unable to implement the lottery authority granted; it requested of Congress more specific guidance in order to effectuate the intended lottery preferences. Congress responded with a revised lottery statute; it amended § 309(i)(3)(A) by deleting the scheme which would have awarded preferences to "groups or organizations, or members of groups or organizations, which are underrepresented in the ownership of telecommunications facilities or properties...." 47 U.S.C. § 309(i)(3)(A). Instead, Congress instituted preferences in mass media service lotteries for applicants who would increase the di-

---

**1.** A comparative hearing is a proceeding before the FCC in which the qualifications of an applicant for a license or permit are compared with those of others and a decision made with regard to issuance or award of the license or permit.

**2.** Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, § 1242, 95 Stat. 357, 736–37, adding subsection 309(i) to the Communications Act of 1934 ("1981 Lottery Statute").

**3.** *See Report and Order,* 89 F.C.C.2d 257, 279–82 (1982), (*"First Lottery Order"*).

versity of ownership of media outlets, or who were members of minority groups. Thus, in the amended statute, adopted in 1982, Congress provided that when licenses or construction permits for "any media of mass communication" were awarded by lottery,

significant preferences will be granted to applicants or groups of applicants, the grant to which of the license or permit would increase the diversification of ownership of the media of mass communications. To further diversify the ownership of the media of mass communications, an additional significant preference shall be granted to any applicant controlled by a member or members of a minority group. 47 U.S.C. § 309(i)(3)(A).

It defined minority group to include "Blacks, Hispanics, American Indians, Alaska natives, Asians, and Pacific Islanders." 47 U.S.C. § 309(i)(3)(C)(ii).

Stella Pappas appears to have been one of very few women to apply for the MMDS licenses; she sought construction permits in 105 markets. At the time she made her applications, Ms. Pappas was aware that had the licenses been issued after comparative hearings, she would have received a preference for female ownership, as well as consideration of her offer to make more innovative and effective use of the radio spectrum through HDTV, a system allowing wide-screen viewing without the distortion ordinarily attending wide screens. Because of her knowledge and interest, when the FCC, on October 14, 1983 released its notice of intention to use lotteries in the assignment of the 1,000 available MMDS licenses, Ms. Pappas submitted comments opposing use of the lotteries because of the loss of the preferences women would have received had the licenses been the subject of comparative hearings. In response to her request that women be given a preference in the lotteries, the Commission noted that the issue of women's preferences was

being considered in a separate proceeding and, that "[t]he results of that proceeding will be applicable to all MMDS lotteries held after that proceeding is completed." [4] In further comments to the Commission, Ms. Pappas proposed the use of a streamlined paper hearing which the Commission did not accept; it concluded that the use of lotteries for assignment of the MMDS licenses was in the public interest.[5] Thereafter, the Commission completed its proceedings and concluded that the preference scheme set up by Congress in 47 U.S.C. § 309(i)(3)(A) applies only to persons who own few media outlets and persons who belong to racial and ethnic minority groups.[6]

## II

### A

Despite the arguments and contentions of the parties, resolving the issue whether the Commission acted reasonably when it decided that issuance of the MMDS licenses should be by lottery, rather than by traditional comparative hearings, does not require extended discussion. The administrative record shows that the Commission was confronted with the problem of dealing with over 16,000 applicants for the 1,000 available MMDS channels. Although this large number was a major consideration in the Commission's lottery decision, it observed the factors which Congress enumerated as relevant in determining whether a lottery would serve the public interest. *See* H.R.Rep. No. 97–765, 97th Cong., 2d Sess. at 17, 37 (1982), *reprinted in* 1972 U.S.Code Cong. & Admin.News 2261, 2281 ("1982 *Conference Report*"). Use of a lottery system adopted pursuant to 47 U.S.C. § 309(i) is discretionary with the Commission, and is proper if it is conducted within the parameters set out by Congress. *Id.* at 40, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 2284. This court

---

4. *Second Report and Order,* No. 80–112 slip op. at 19 n. 38 (F.C.C. Feb. 1, 1985) ("MMDS Order").

5. *Id.* at 5.

6. *Third Report and Order,* No. 81–768, slip op. at 1 (F.C.C. Sept. 5, 1985) 50 Fed.Reg. 36,056. (*"Women's Preference Order"*).

has held that when we review an action of the Commission, we are to set it aside only where it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *City of New York Municipal Broadcasting System v. F.C.C.*, 744 F.2d 827, 836 (D.C.Cir.1984); *cf. National Congress of Hispanic American Citizens v. Marshall*, 626 F.2d 882, 888 (D.C.Cir. 1979); 5 U.S.C. § 706(2)(A).

■ Certainly, it cannot be said that the Commission's action in deciding to use lotteries for the MMDS licenses was arbitrary and capricious; it gave notice of its intention to thus proceed, received comments including those of petitioner, and after considering the relevant factors, decided that lotteries were in the public interest. This decision was supported by the record, and based on a proper understanding of the law. "Abuse of discretion may be found 'only if there is no evidence to support the decision or if the decision is based on an improper understanding of the law.'" *Jaimez-Revolla v. Bell*, 598 F.2d 243, 246 (D.C.Cir.1979) (*quoting Son Jook Suh v. Rosenberg*, 437 F.2d 1098, 1102 (9th Cir. 1971)). There is no basis in the record for a holding that the Commission abused its discretion; its action evidenced a rational decision-making process. *See Office of Communication of United Church of Christ v. F.C.C.*, 707 F.2d 1413, 1424 (D.C. Cir.1983).

### B

■ With regard to the issue whether the Commission was correct in its process of statutory construction, we notice immediately that, using its established administrative procedures, the Commission construed a statute which it administers and that, from the language of § 309(i), it appears that Congress did not directly speak to the question the Commission had before it. Clearly, Congress did not expressly include women in the statutory definition of "minority group," as that term is used in 47 U.S.C. § 309(i)(3)(C)(ii). Petitioner concedes as much.

The statute, instead, established two preferences: one for applicants who are, or are controlled by, members of a minority group, the other for applicants who would diversify the ownership of mass communications media (the "media ownership preference"). 47 U.S.C. § 309(i)(3)(A).

In formulating the statutory construction contained in its *Third Report and Order*, the Commission studied the 1981 amendment to the Act, and its legislative history; it carefully noted the language Congress used in defining and limiting the preferences to be given when lotteries are conducted. It then studied the terms of the 1982 statute and compared its language with that contained in the 1981 amendment which Congress was rejecting. The Commission observed that in the 1982 statute, Congress had directed "a narrowly drawn preference scheme" which contained two kinds of preferences, one for applicants who own few or no other media outlets, and another for those applicants who are owned or controlled by minorities. The legislative history made clear the precise detail and manner in which Congress intended the "carefully designed preference scheme" to be administered by the Commission. 1982 *Conference Report* at 45, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 2289. Considering carefully the language of Congress, the Commission concluded that women were not entitled to preferences under either the media ownership provision or the minority group provision of § 309(i)(3)(A).

With regard to the media ownership preference, the Commission first noted that the statute did not on its face contemplate such a preference being awarded to women on the basis of gender. Then, after examining the statute's legislative history, it concluded that Congress intended that application of the preference be limited to diversification under traditional concentration standards based on the number and location of other mass media outlets owned or con-

trolled by the applicant. *See* 1982 *Conference Report* at 41–43, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 2285–87.

As to the minority preference, the Commission carefully studied § 309(i)(3)(C)(ii) which states that

> The term "minority group" includes Blacks, Hispanics, American Indians, Alaska natives, Asians, and Pacific Islanders.

Consistent with an argument petitioner makes before us, it recognized that the word "includes" is a term of enlargement, not of limitation; therefore, others may be includable in the groups enumerated. In view of this, the Commission considered whether women, as a class, have qualities which are common to those in the groups enumerated in the statute. After careful consideration, it decided that the word "includes," in the context of § 309(i), was used by Congress to include only those persons who belong to racial or ethnic groups, or persons belonging to a class of mixed racial or ethnic ancestry. Therefore, since women as a class are not like any of the enumerated groups so as to constitute a "minority group," the Commission construed the statute to mean that women are not included within the language of § 309(i)(3)(C)(ii).[7]

Having decided on these constructions of the statutory language, the Commission considered whether it had the discretion, either under § 309(i) or under its general public interest authority, to create for women a preference in addition to the two Congress had specifically mandated. The Commission found that it had no such authority. We hold that in conducting mass lotteries, the Commission has no discretion to grant women a preference equivalent to the preferences Congress awarded to other groups. We must assume that had Congress intended women to receive such a preference in mass lotteries, Congress would have included women in the statutory preference scheme. We do not decide, because nothing in the case compels us to do so, whether the Commission may use its residual authority in the lottery context to grant women a preference of a different kind or lesser magnitude than the preferences established in § 309(i).

In *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court has told us that

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute. *Id.* 104 S.Ct. at 2781–82 [footnotes omitted].

This being a case in which the statute is silent or ambiguous with respect to the specific issue, the question before us is whether the agency's answer is based on a permissible construction of the statute.

We think it is. More importantly, in a case like this one, although the judiciary is

---

7. The Commission also noted that the 1982 *Conference Report* expressly referred to the issue of a lottery preference for women: "[W]omen ... would, of course, be eligible for both media ownership and minority ownership preferences if they meet the eligibility guidelines." 1982 *Conference Report* at 44–45, *reprinted in* 1982 U.S.Code Cong. & Admin.News at 2288–89. The Commission concluded that Congress intended that women were to receive minority ownership preferences only to the extent that they were members of racial or ethnic minority groups.

the final arbiter of statutory construction and we must reject administrative constructions which are contrary to clear congressional intent, *Chevron,* 104 S.Ct. at 2781–82 n. 9, "we accord the 'view of the agency charged with administering the statute ... considerable deference'," *Capitol Technical Services, Inc. v. F.A.A.,* 791 F.2d 964, 971 (D.C.Cir.1986) (*quoting, Chemical Manufacturers Assoc. v. Natural Resource Defense Council Inc.,* 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985); *see Population Institute v. McPherson,* 797 F.2d 1062, 1068–69 (D.C. Cir.1986). Our role is to determine "whether the Commission's interpretation of the statute is 'sufficiently reasonable.' " *Federal Election Committee v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). We need not conclude that the agency's construction was the only one it permissibly could have adopted in order to uphold it. *Id.* at 39, 102 S.Ct. at 46. The Commission's construction of § 309(i)(3)(C)(ii) satisfies these tests.

### III

For these reasons, we conclude that the Commission acted reasonably when it decided it was in the public interest to award mass media licenses by lotteries; and it acted properly in declining to award preferences to women in mass media licensing lotteries under 47 U.S.C. § 309(i)(3)(A). Therefore, the petitions for review are.

*Denied.*