**CAPITOL TECHNICAL SERVICES, INC., Petitioner,**

**v.**

**FEDERAL AVIATION ADMINISTRA- TION, Department of Transportation, Respondents.**

**No. 85–1422.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 16, 1986.

Decided June 3, 1986.

Susan B. Jollie, with whom Morris B. Garfinkle, Washington, D.C., was on brief, for petitioner.

Edward J. Shawaker, Atty., Dept. of Justice, with whom James S. Dillman, Asst. Chief Counsel, F.A.A., and Anne S. Almy, Dept. of Justice, Washington, D.C., were on brief, for respondents.

Before WALD, MIKVA and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

Petitioner Capitol Technical Services, Inc. ("Capitol") provides aircraft maintenance services to foreign airlines. On appeal Capitol challenges the specific refusal of the Federal Aviation Agency ("FAA") to exempt certain foreign aircraft seeking to use its maintenance facilities in the United States from domestic noise control regulations covering four-engine jet aircraft,[1] and the FAA's general policy against such exemptions. Capitol contends that the application of the noise control regulations to the ferrying flights of foreign aircraft for maintenance is arbitrary, capricious and contrary to law.

In response, the FAA first maintains that this case is moot; the scheduled time for the specific ferrying flights at issue has come and gone, and the required maintenance has presumably been performed elsewhere. In addition, the FAA defends its position on substantive grounds, asserting that its refusal to carve out an exception to its noise-compliance regulations for maintenance flights is in harmony with congressional will.

1. *See* 14 C.F.R. § 91.303 (1985).

We agree with Capitol that this case is justiciable. Although the challenge to the rejection of the particular exemption requests is plainly moot, the petitioner's claim that the FAA policy against granting exemptions to foreign aircraft for maintenance flights is unlawful survives. On the merits, however, we are in accord with the agency position that its decision was reasonable, and we therefore affirm.

## I. BACKGROUND

### A. *Statutory and Regulatory Framework*

In 1968, Congress enacted legislation granting the FAA broad authority to regulate aircraft noise.[2] As a result, the FAA implemented a schedule of gradual aircraft noise reduction.

In 1969, the agency imposed certain noise control criteria as prerequisites for approval or "original type certification" for any new aircraft design.[3] In 1973, noise control standards were applied to all aircraft *produced* after 1973, regardless of when they obtained original type certification.[4] In 1977, a further extension was made—permissible noise levels were lowered to reflect technological advances in aircraft design. These new, more stringent restrictions apply to all aircraft designed after 1975.[5]

The practical problems in this case arose when the FAA decided to regulate aircraft certificated before 1969 and built before 1974, denominated Stage 1 aircraft, which were not initially subject to regulatory noise controls. On December 23, 1976, the FAA amended its regulations and applied its noise control criteria to all remaining unregulated civilian aircraft.[6] That rule prohibited the operation of *any* noncompliant four-engine aircraft by a domestic operator after January 1, 1985. Stage 1 aircraft operators could achieve compliance by selecting any of the following options: (1) purchasing compliant aircraft; (2) reengining noncompliant aircraft; or (3) "retrofitting engine nacelles and fan ducts with sound absorbing materials, or 'hush kits.'"[7]

As noted, the regulations at their inception applied only to domestic operators, but the FAA warned foreign carriers that, absent some international agreement on the subject, it would apply the standard to aircraft engaged in foreign air commerce.[8] In 1979 Congress, too, warned the industry. It addressed the aircraft noise problem for a second time in the Aviation Safety and Noise Abatement Act of 1979 ("ASNA").[9] ASNA provided that the January 1, 1985 compliance deadline governing domestic operators would be extended to cover foreign aircraft operating in the United States unless the International Civil Aviation Organization ("ICAO") adopted noise standards substantially compatible with the FAA regulations.[10]

In November 1980, after determining that the ICAO had failed to act, the FAA amended the noise regulations to apply the January 1, 1985 deadline to aircraft in foreign commerce.[11] Based on certain preca-

---

**2.** 49 U.S.C. § 1431 (1982).

**3.** 34 Fed.Reg. 18,355 (1969).

**4.** 38 Fed.Reg. 29,569 (1973).

**5.** In developing progressively more restrictive aircraft noise standards, the categories of standards became known by the shorthand terms the FAA now utilizes. State 1 aircraft are those type-certificated before 1969 and manufactured before January 1, 1974, and thus not subject to any noise requirements at the time of certification. Stage 2 aircraft are those type-certificated after 1969 or built after December 31, 1974, which must conform to the first mandatory noise standards issued by the FAA. Stage 3

aircraft are those for which applications for type certificates were made after November 5, 1975, which must meet the lowest noise levels which have become technologically practicable.

**6.** 41 Fed.Reg. 56,046 (1976).

**7.** *Airmark Corp. v. FAA,* 758 F.2d 685, 688 (D.C. Cir.1985).

**8.** 41 Fed.Reg. at 56,053–54.

**9.** 49 U.S.C. §§ 2101 *et seq.* (1982).

**10.** 49 U.S.C. § 2122 (1982).

**11.** 45 Fed.Reg. 79,302 (1980).

tory language in the ASNA Conference Committee Report, the FAA also decided to award some limited exemptions from compliance with the regulations.[12]

## B. *The Airmark Case and the New Exemption Standards*

As the January 1, 1985 deadline for compliance approached, the FAA addressed a substantial number of exemption requests; predictably, a number of disappointed applicants sought judicial review of the FAA denials. This circuit stayed enforcement of the regulations as to aircraft operators who met certain conditions and expedited review of three test cases. On March 29, 1985, the court concluded that the FAA had "broad authority" to grant exemptions from its regulations in the public interest, but that its exercise of that authority in the cases under review had been arbitrary and capricious due to its inconsistent treatment of similarly situated carriers.[13] The panel remanded the matter to the FAA, instructing the agency to adopt and implement a lawful exemption policy.[14]

The FAA announced its new policy in an adjudicatory order relating to an exemption request. That decision, styled *In the Matter of the Petition of Lineas Aereas del Caribe, S.A.*[15] ("the *LAC* decision"), set forth the standards the FAA would follow in considering exemption requests. These criteria are:

(1) The petitioner must be a "smaller" carrier;

(2) The petitioner must make a good faith effort at compliance;

(3) The needed technology must be delayed or unavailable;

(4) The petitioner could suffer financial havoc if an exemption is denied;

(5) The petitioner performs a valuable airline service.[16]

We are confronted in this case with the application of these standards to exemption requests by foreign operators seeking approval for ferrying flights to United States airports solely to undergo repair and maintenance checks.

## C. *Administrative Proceedings*

On April 29, 1985, Capitol and Nolisair International, Inc. ("Nolisair"), a foreign aircraft operator, filed an exemption petition with the FAA. They requested that two noncomplying DC–8s belonging to Nolisair be permitted to fly from Montreal, Canada to Smyrna, Tennessee to enable Capitol to perform needed maintenance. The requested flights were to occur in May and June 1985. The application requested exemptions for two specified flights, but also argued generally that Congress intended that exceptions be made for flights of noncompliant aircraft seeking to use American maintenance facilities.[17]

On June 4, 1985, Capitol and Nolisair filed a petition for mandamus to compel the FAA to act on their petition and a motion for an emergency stay of the FAA regulation, the effect of which would have been a

---

**12.** The Conference Committee Report stated:

[T]he FAA is urged to give consideration to hardship situations involving smaller carriers where the carrier is making a good faith compliance effort but needed technology is either delayed or unavailable and rigid adherence to compliance deadlines could work financial havoc and deprive the public of valuable airline service.

H.R.Rep. No. 715, 96th Cong., 1st Sess. 23 (1979).

**13.** *Airmark Corp. v. FAA*, 758 F.2d at 691–92.

**14.** The decision stated:

It is for the FAA ..., and not this court, to determine the circumstances in which exemptions should be granted or denied.... We will not prescribe particular criteria for the

FAA to apply; the FAA retains broad discretion to determine whether the public interest will be best served by granting or denying petitions. We must insist, however, that the FAA act upon the petitions in a consistent manner and that any deviation from prior rulings be carefully reasoned and fully explained.

*Id.* at 695.

**15.** FAA Docket No. 24028–2 (April 26, 1985), *reprinted in* Joint Appendix ("J.A.") 17–24.

**16.** *Id.* at 2.

**17.** *See* Request for Exemption from Federal Aviation Regulation 91.303, 14 C.F.R. § 91.303 (April 29, 1985), *reprinted in* J.A. 1–10.

temporary exemption. On June 7, 1985, this court denied the mandamus and stay requests and declined to expedite review.

On June 12, 1985, the FAA denied the requested exemption. In so doing, the agency stated that the purpose of the noise regulations would be defeated if exemptions were routinely granted for ferrying flights for maintenance purposes. Such a policy would create "numerous similar requests to operate non-compliant aircraft in the U.S. for that purpose, which, if granted, would seriously undermine the basic purposes of the ASNA."[18] Thus, the FAA stated that it would continue to adhere to the criteria announced in the *LAC* decision when awarding exemptions.

Applying those standards, the agency denied the exemption because Nolisair had not made a good faith attempt to comply with the noise regulations. Capitol petitioned for review of this order.

## II. ANALYSIS

### A. *Justiciability*

The FAA maintains that this case is moot. The agency observes that Nolisair and Capitol sought exemptions for two specific flights by Nolisair aircraft scheduled for May and June 1985, and that much of the exemption petition describes the details of those particular flights. The time for these flights has passed, and Nolisair, the airline purportedly in need of the exemption, has not joined this petition for review. If Capitol wishes to obtain exemptions for future flights by noncompliant foreign operators to its maintenance facilities, the agency asserts, it should reapply for exemptions and, if unsatisfied, seek review of those decisions.

We find the agency's argument plainly meritless in light of this circuit's recent decision in *Better Government Assoc. v.*

*Department of State,*[19] a case on all fours with this one. In that case, nonprofit public interest organizations requested documents from two government departments pursuant to the Freedom of Information Act ("FOIA") and claimed that they were statutorily entitled to waivers of FOIA's search and copying fees. Initially, the Government denied the waiver requests, but, subsequently, it reversed its position, waived the fees at issue and sought to dismiss the case as moot. We held that

[a]lthough the challenges to the guidelines ... as applied to the particular fee waiver requests are indisputably moot, it is equally clear that the appellants' claims that the ... guidelines ... are facially invalid survive.[20]

■ *Better Government* and the instant case are precisely analogous. The appellant's challenge to the denial of the exemption request *"as applied to the[ ] specific ... requests* is, in fact, moot."[21] We cannot turn back the clock and order the FAA to permit certain flights in 1985. It is equally clear, however, that the FAA denied Capitol's request for an exemption pursuant to an enunciated *general policy decision* to forbid all noncompliant foreign aircraft to engage in ferrying flights for scheduled maintenance; Capitol's challenge to this general policy is not moot. The FAA concedes that, in their petition, appellant argued that the FAA's *general policy* against exemptions is unlawful because it is at odds with a congressional intention to encourage the use of American maintenance facilities.[22] Clearly Capitol sought not only a particular exemption, but also a decision favorable to the continued viability of its business servicing noncompliant foreign aircraft. Thus, as in *Better Government,* the mootness of the individual requests does not render the challenge to the agency policy nonjusticiable.[23]

---

**18.** Denial of Exemption, Docket No. 24615 (June 12, 1985), *reprinted in* J.A. 15–16.

**19.** 780 F.2d 86 (D.C.Cir.1986).

**20.** *Id.* at 88.

**21.** *Id.* at 91.

**22.** Brief for Respondents at 7–8.

**23.** *See Better Government Assoc.,* 780 F.2d at 91–92; *see also Super Tire Engineering Co. v. McCorkle,* 416 U.S. 115, 121–22, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974). Although it became clear at oral argument that full judicial review cannot be had in the time span within which it

Although the FAA has characterized its justiciability challenge in terms of mootness,[24] its reliance on *Webb v. Department of Health and Human Services* [25] reveals that its argument also implicates ripeness considerations. Once again, *Better Government* is controlling. In that case we found that the Supreme Court's dual pronged test for ripeness had been satisfied. That test requires the court to evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." [26] The *Better Government* panel held that the issues presented were fit for judicial review because they involved purely legal questions and because the agency action had taken final form. Second, the court decided that appellants had demonstrated hardship by showing that "the impact of the administrative action could be said to be felt immediately by those subject to it in conducting their day-to-day affairs." [27]

■ In the instant case, too, we are confronted with purely legal questions—that is, whether the agency decision comports with legislative intent and conforms to certain procedural guidelines. The factual context of a particular ferrying flight for

maintenance purposes is not necessary to our analysis of the legality of a ban against all flights by noncompliant aircraft.[28] Furthermore, there can be no question that the agency action has taken final form; indeed, the agency has not even suggested that any further policy evolution could be expected. Finally, the hardship to Capitol is concrete and easily perceived; noncompliant foreign aircraft cannot reasonably be expected to contract with Capitol for major maintenance at locations they cannot reach. The decision "purport[s] to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business of [the appellants]," [29] and the loss of business suffered by Capitol as a result of the FAA policy plainly rises to the level of hardship.[30]

In short, this case is unquestionably justiciable under the law of this circuit.

### B. *The FAA Decision*

The substantive question presented in this case is whether the FAA must create an exemption from its noise control regulations for the ferrying flights of noncompliant foreign aircraft for maintenance pur-

is realistic to schedule maintenance checks, we need not decide whether the rejection here is "capable of repetition yet evading review." *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Capitol's petition for review challenges an admitted agency *policy* not to grant exemptions of this sort.

**24.** Brief for Respondents at 10.

**25.** 696 F.2d 101 (D.C.Cir.1982).

**26.** *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967).

**27.** *Toilet Goods Assoc., Inc. v. Gardner,* 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967).

**28.** In *Webb v. Department of Health and Human Services,* this court held that the appellant's challenge to a Food and Drug Administration ("FDA") regulation was not ripe. The appellant in that case challenged a regulation restricting his access to certain information, but, in the course of the litigation, the information at issue was released. Thus, the individual request be-

came moot and only the challenge to the facial validity of the FDA regulation remained. We determined that the challenge to the FDA rule at issue was uniquely fact-based and that "the validity of applying [the regulation] to a FOIA request [would] vary depending on what information is actually contained in the ... file." 696 F.2d at 106. Without a particularized request for documents pending, the court felt that it would have "to conduct a pseudo-rulemaking proceeding, examining all of the considerations that led the agency to permit or prevent disclosure in the various situations" in order to adjudicate the validity of the regulation. What differentiates the instant case is that here the *agency* has already enunciated a decision that will control all future exemption requests covering noncompliant foreign aircraft; thus, the sole task of the court is to review the legality of the FAA's enunciated policy. No judicial "pseudo-rulemaking" will occur.

**29.** *Abbott Laboratories,* 387 U.S. at 152, 87 S.Ct. at 1517.

**30.** *See also American Federation of Government Employees v. FLRA,* 750 F.2d 143, 145 (D.C.Cir. 1984).

poses. The Federal Aviation Act empowers the agency to grant exemptions from its regulations if "such action would be in the public interest." [31] This court has recently emphasized that "the FAA has broad discretion to determine whether the public interest would or would not be served by granting noncompliant carriers exemptions from the noise regulations" [32] so long as the agency does not exercise that authority in an arbitrary or capricious manner. It is with these principles of deference in mind that we review the FAA's refusal to grant exemptions in the circumstances presented in this case.

The FAA declined to grant exemptions for maintenance flights, reasoning as follows:

> The FAA noise compliance rule, which is based on the statutory mandate of the Aviation Safety and Noise Abatement Act of 1979 (ASNA), is designed to reduce or eliminate excessive aircraft noise. Aircraft noise is generated to substantially the same extent by a flight for maintenance purposes as it is by a flight for revenue purposes. To argue, as petitioner does, that two (or any number of) flights for maintenance purposes lie outside the LAC order and, indeed the noise rule, ignores the whole basis for the noise rule and for the explanation given in the LAC order of the criteria on which the very limited number of exemptions from the noise rule will be granted. Moreover, a grant of exemption for maintenance flights would likely result in numerous similar requests to operate noncompliant aircraft in the U.S. for that purpose, which, if granted, would seri-

ously undermine the basic purpose of the ASNA.[33]

The agency decided that the purposes of the ASNA would be significantly vitiated if the exception petitioners requested was made. We find this analysis reasonable.

Capitol's primary argument to the contrary is that the instant refusal violates both the agency's governing statute and congressional will. Appellant first contends that the intended application of the noise regulations was solely to aircraft engaged in "foreign air commerce" or "foreign air transportation" as defined in the Federal Aviation Act.[34] The statutory definitions of these terms, according to Capitol, "include as a core concept providing service for 'compensation or hire' between the United States and a foreign point." [35] Congress purportedly revealed its intention to regulate only commercial flights by using the phase "engaging in foreign air transportation" in the ASNA Conference Report when discussing the imposition of noise control standards and by *failing* to discuss noncommercial flights.[36] From this, appellant deduces that Congress did not intend the noise limitations to apply to the nonrevenue flights of noncompliant foreign operators.[37]

We cannot accept this argument which relies on an extremely attenuated connection between the statutory framework and the language in a legislative report. When, as here, Congress has not "directly spoken to the precise question at issue," [38] the reviewing court asks only if the agency's interpretation of the statute "represents a reasonable accomodation of conflicting policies that were committed to the agency's care by the statute." [39] In

---

31. 49 U.S.C. § 1421(c) (1982).

32. *Airmark Corp. v. FAA,* 758 F.2d at 691.

33. Denial of Exemption, *supra* note 18, at 2.

34. 49 U.S.C. § 1301(23)–(24) (1982).

35. Brief for Petitioner at 16.

36. H.Rep. No. 715, *supra* note 12, at 22.

37. The regulation itself has no such limited scope. It provides that "no person may operate

to or from an airport in the United States" any noncompliant aircraft. 14 C.F.R. § 91.303 (1985).

38. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

39. *Id.* at 845, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

pursuing this inquiry we accord the "view of the agency charged with administering the statute ... considerable deference." [40] The agency position must be "based on a permissible construction of the statute;" [41] it need not be the construction a court might find superior.

■ Under these standards Capitol's argument must fail. Congress has not spoken to this issue; nothing in the legislative history of ASNA manifests an intent to create the sort of permanent exemption for maintenance flights requested by Capitol. The ASNA Conference Report reveals a congressional concern that exemptions be granted to commercial operators under certain well-defined circumstances; its silence on the subject of nonrevenue flights cannot be construed as a command that they be exempted. [42]

■ In addition, the FAA's interpretation of the ASNA mandate is plainly permissible, and its balancing of the overriding congressional intent to achieve noise compliance with the legislature's subsidiary interest that certain carriers receive exemptions was reasonable. The agency decided that the public interest in noise compliance outweighed the combined interests of noncompliant foreign operators who provide no commercial service to the United States public and the financial interest of United States maintenance facilities. We recognize that the agency *could* have struck a different balance among these conflicting interests, but it was not compelled to do so.

■ Nor is our view altered by Capitol's reliance on the legislative history surrounding the enactment of the Hawkins-Chiles Amendment. [43] In that provision, Congress required the FAA to grant exemptions to certain noncompliant aircraft flying into the Miami, Florida and Bangor, Maine airports. There is, in a colloquy on the Senate floor, a suggestion that the sponsoring Senators hoped that exceptions to ASNA's requirements would also be made for noncompliant foreign planes requiring maintenance work. [44] However, what we find far more significant than this colloquy [45] is the absence of any trace of an exception to the regulations for maintenance purposes in the final Hawkins-Chiles enactment. It is extremely risky for courts to second-guess agency judgments regarding exemptions when Congress has created a general rule and itself has carved out certain exceptions, but has *not* made the exception desired by a litigant. Under these circumstances, the agency's refusal to make further inroads in a general congressional policy decision is eminently reasonable. [46]

## III. CONCLUSION

We hold that this case is justiciable and that the FAA's refusal to award exemptions to foreign aircraft for ferrying flights

---

**40.** *Chemical Manufacturers Assoc. v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985).

**41.** *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

**42.** *Symons v. Chrysler Corp. Loan Guarantee Bd.,* 670 F.2d 238, 242 (D.C.Cir.1981) ("[d]rawing inferences as to congressional intent from silence in legislative history is always a precarious business").

**43.** Pub.L.No. 98–473, 98 Stat. 1837 (1984).

**44.** *See* 130 CONG.REC. S14,214 (daily ed. Oct. 11, 1984) (colloquy between Sen. Hawkins and Sen. Chiles).

**45.** *See American Federation of Government Employees v. FLRA,* 712 F.2d 640, 647 (D.C.Cir. 1983) ("It is settled that courts construing statutory language should give little weight to postenactment statements by members of Congress.").

**46.** Capitol has also argued that the FAA has, in its decision in this case, promulgated a new rule without proper notice and comment rulemaking. We find that the agency decision to proceed in this matter by adjudication rather than by notice and comment rulemaking was well within its discretion. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); *SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); *New York State Comm'n on Cable Television v. FCC,* 749 F.2d 804, 815 (D.C. Cir.1984).

for maintenance purposes was a lawful exercise of agency discretion.

*Affirmed.*