# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

–––––

Argued September 10, 2004     Decided December 10, 2004

No. 02-1199

ENTERGY SERVICES, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SOUTHERN COMPANY SERVICES, INC., ET AL.,
INTERVENORS

–––––

Consolidated with
02-1336, 02-1375, 03-1023

–––––

On Petitions for Review of an Order of the
Federal Energy Regulatory Commission

–––––

*J. Wayne Anderson* argued the cause for petitioners. With him on the briefs were *Floyd L. Norton, IV.*, *Heath K. Knakmuhs*, *S. Chris Still*, *Kevin A. McNamee,* and *Gerard A. Clark*. *Andrew W. Tunnell* and *Matthew W. Estes* entered appearances.

*Thomas D. Samford, IV*, was on the brief for Alabama Public Service Commission in support of petitioner and reversal of orders.

*Marlene K. Stern* was on the brief of *amicus curiae* Florida Public Service Commission in support of petitioner and urging reversal. With her on the brief was *David E. Smith. Harold A. McLean* entered an appearance.

*Thurbert E. Baker,* Attorney General, Attorney General's Office of the State of Georgia, and *Daniel S. Walsh*, Assistant Attorney General, were on the brief for *amicus curiae* Georgia Public Service Commission in support of petitioner.

*Dennis Lane*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Cynthia A. Marlette*, General Counsel, and *Laura J. Vallance*, Attorney.

*Ashley C. Parrish* argued the cause for intervenor Tenaska, Inc. With him on the brief was *Neil L. Levy.*

Before: SENTELLE, TATEL and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* TATEL.

SENTELLE, *Circuit Judge*: Electricity utility companies Entergy Services, Inc., Southern Company Services, Inc., and Nevada Power Company, Inc., petition for review of various orders of the Federal Energy Regulatory Commission in which the Commission held that certain costs incurred by customers connecting generators to petitioners' networks must be "spread" across all customers and not "directly assigned" to the respective

generator companies. Specifically, the Commission found that because the connection facilities in each case were located "at or beyond" the point of connection to the network, they constituted "network upgrades" not directly assignable to individual generators.

Petitioners contend (1) that the Commission's orders should be reversed because they are unsupported by substantial evidence, and (2) that the Commission's orders should be reversed because the "At or Beyond" rule constitutes an arbitrary departure from Commission precedent. Because we agree with Intervenor Tenaska, Inc. that Entergy and Southern lack standing to pursue their claims, we limit our review to the objections advanced by Nevada Power. However, because we hold that the order from which Nevada Power petitions has not adequately explained the Commission's apparent departure from prior practice, we vacate and remand that order for further proceedings.

## I. Background

### A. *Regulatory Background*

Petitioners in this case–Entergy Services, Inc. ("Entergy"), Southern Company Services, Inc. ("Southern"), and Nevada Power Co. ("Nevada Power")–are electricity utility companies that own transmission systems providing electricity to large geographic regions. In order to foster a more competitive, efficient market for electricity, federal regulation requires that such "transmission providers" open their networks to transmission customers–other sellers of electricity seeking to supply power to their own customers. *See Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No.

888, FERC Stats. & Regs. ¶ 31,036 (1996), 61 Fed. Reg. 21,540 ("Order No. 888"), *on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048, 62 Fed. Reg.12,274 (1997), *on reh'g*, Order No. 888-B, 81 F.E.R.C.¶ 61,248 (1997), *on reh'g*, Order No. 888-C, 82 F.E.R.C. ¶ 61,046 (1998), *aff'd*, *Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom.*, *New York v. FERC*, 535 U.S. 1 (2002).

In implementation of Order No. 888, the Commission promulgated a pro forma Open Access Transmission Tariff ("OATT") that sets forth the minimum terms and conditions under which transmission providers may offer their services to would-be customers. *See* Order No. 888-A at 30,503-43 (including the final OATT); 18 C.F.R. § 35.28(c)(1) (requiring public utilities owning, controlling, or operating facilities transmitting electricity in interstate commerce to "have on file with the Commission a tariff of general applicability for transmission services" or a tariff approved by the Commission consistent with Order No. 888).

Under this tariff regime, some costs incurred by an interconnecting customer are borne by the respective customer, while other costs are spread across all customers on the network. In general, when a Generator of electricity connects to a Transmission Provider's network consistent with Order No. 888, the Transmission Provider cannot require the Generator to bear costs incurred for the development of equipment that benefits all users of the network. *Duke Energy Co.*, 95 F.E.R.C. ¶ 61,279 at 61,980 (2001). Such costs, spread across all customers, are known as "network upgrades." The Generator must initially finance the costs, but upon completion of the interconnection project the Transmission Provider spreads the cost among all customers and rebates to the Generator its initial investment by providing it with transmission credits against its tariff expenses. By contrast, when a new Generator incurs cost developing

equipment of no benefit to the existing customers, the costs are assigned to the Generator alone. This is known as "direct assignment," and the equipment is known as "direct assignment facilities."

The specific tariff and other interconnection details are finalized in an Interconnection Agreement ("IA") between the Transmission Provider and the Generator. IAs are drafted by the parties and are submitted to the Commission for approval.

## B. *Factual Overview*

The consolidated cases before this court arise from the Commission's disapproval of four IAs submitted for its approval.

Entergy submitted an unexecuted IA to the Commission on November 14, 2001. Amelia Energy Center, LP ("Amelia") was the other party to the agreement. At issue were two connection facilities: (1) a new Switching Station section to accommodate two new 230 kV radial power lines from the Generators; and (2) the re-routing of three existing power lines. The Commission held that the IA could not directly assign costs for the facilities at issue to Amelia, because the facilities were located "at or beyond" the point of interconnection with the grid, and as such provided benefit to all users. *See Entergy Gulf States, Inc.*, 98 F.E.R.C. ¶ 61,014 (2002), *reh'g denied,* 99 F.E.R.C. ¶ 61,095 (2002). On June 14, 2002, the Commission accepted Entergy's proposed termination of the IA; prior to termination, the IA was of indefinite duration.

Southern submitted two IAs for Commission approval. It submitted its first IA, between its Alabama Power transmission system and Blount County Energy, LLC ("Blount"), on November 30, 2001. At issue was a replacement

breaker at the Miller Steam Plant substation. The Commission held that the cost of the breaker could not be directly assigned to the Generator, in light of the "At or Beyond" rule. *Southern Company Services, Inc.*, Letter Order, Docket No. ER02-430-000 (Jan. 25, 2002), *reh'g denied*, 100 F.E.R.C. ¶ 61,246 (2002). On January 24, 2003, the Commission accepted Southern's request to terminate the Blount IA; prior to termination, the IA was of a forty-year term, subject to prior termination by mutual assent.

Southern submitted its second IA, between its Georgia Power transmission system and Athens Development, LLC ("Athens"), on June 5, 2002. At issue were three 115 kV breakers at two Georgia Power substations. The Commission held that the cost of the breakers could not be directly assigned to Athens, in light of the "At or Beyond" rule. *Southern Company Services, Inc.*, Letter Order, Docket No. ER02-2015-000 (July 30, 2002), *reh'g denied*, 101 F.E.R.C. ¶ 61,309 (2002). On August 9, 2002, Southern filed a "Notice of Cancellation" regarding the Athens IA. *See Southern Company Services*, 103 F.E.R.C. ¶ 61,279 (2003). The IA was cancelled effective January 6, 2003, when the parties submitted a revised IA. Prior to cancellation, the original IA was of a term of no less than ten years, subject to exceptions.

Nevada Power submitted an unexecuted IA to the Commission on May 29, 2002. GenWest, LLC ("GenWest") was the other party to the agreement. At issue was a "one line terminal" to be added to Nevada Power's Harry Allen 500 kV Switchyard. The Commission held that the cost of the one line terminal could not be directly assigned to GenWest, in light of the "At or Beyond" rule. *Nevada Power Co.*, 100 F.E.R.C. ¶ 61,077 at 61,302 (2002) ("*Nevada Power I*"), *reh'g denied*, 101 F.E.R.C. ¶ 61,036 (2002) ("*Nevada Power II*"). Neither party has cancelled the agreement. It is for a term of at least ten years,

subject to exceptions.

Following these administrative proceedings, Entergy, Southern, and Nevada Power filed these petitions for review.

## II. Analysis

### A. *Jurisdiction*

Three of the four IAs at issue in these consolidated cases have been cancelled by the parties, with the consent of the Commission. Therefore, the cases arising under those three contracts are now moot, and we lack jurisdiction to hear these petitions. Moreover, because petitioners fail to show injury in fact resulting from the Commission's "At or Beyond" rule *per se*, they lack standing to challenge generally the Commission's policies that underlie those orders.

A challenge to a specific Commission order regarding an interconnection agreement is moot when the contract is terminated. *Northwest Pipeline Corp. v. FERC*, 863 F.2d 73, 76-77 (D.C. Cir. 1988) ("Obviously, the challenged rate terms disappeared into the regulatory netherworld when the certificates themselves entered the archives. . . . Thus, to the extent it seeks [review of Orders affecting the certificates, Petitioner's] claim is, beyond reasonable dispute, moot."). The Entergy and Southern IAs have joined their predecessors in the regulatory netherworld; Entergy and Southern bring no live controversy to this court. Arguably, at least, the flaw in jurisdiction over two of the IAs should be viewed entirely in terms of standing rather than mootness, as Entergy and Southern (with reference to its second petition) had already terminated their IAs before seeking the assistance of an Article III court. By way of comparison, in *Advanced Management Technology, Inc. v. FAA*, 211 F.3d 633 (D.C. Cir. 2000), we had to decide

whether standing or mootness doctrine applied in a situation where the petitioner filed its challenge to the agency's termination of a contract *after* the agency had re-awarded the contract to petitioner. "The claim may sound like one of mootness–a justiciable controversy existed but no longer remains–but the timing makes [Petitioner's] problem one of standing . . . . Standing is assessed 'at the time the action commences,' i.e., in this case, at the time [Petitioner] sought relief from an Article III court." *Id.* at 636 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 191 (2000)) (internal citation omitted). In any event, we lack Article III jurisdiction to consider their specific complaints.

Petitioners treat the justiciability analysis as a question of mootness. Under the mootness analysis, Petitioners argue that a challenge to agency action is not moot "where there is a reasonable chance of the dispute arising again between the government and the same [petitioner]." *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State*, 74 F.3d 1308, 1311 (D.C. Cir. 1996) ("*LAVAS*"), *vacated on other grounds*, 519 U.S. 1 (1997). Granted, we so held in *LAVAS*, but that is not a parallel for the present case. In *LAVAS*, we noted that the precedents upon which we relied therein stood "for the proposition that the government cannot escape the pitfalls of litigation by simply giving in to a plaintiff's individual claim without renouncing the challenged policy . . . ." *Id.* That is not what happened in the petition before us today. The government did not give in; Petitioners abandoned the petition. While it may be true that the government cannot by selective surrender establish mootness to prevent challenge to its policies, this does not prevent mootness from occurring where the would-be challengers have abandoned the case or controversy that they would have us decide. The Entergy and Southern petitions fall into the latter category, not the former. There is no ongoing case or controversy. These challenges are moot.

These Petitioners cannot take refuge under the broader doctrine of "capable of repetition yet evading review." *See, e.g.*, *Weinstein v. Bradford*, 423 U.S. 147, 148-49 (1975). The very contracts at issue establish operative terms of at least ten years. Some were of indefinite duration. Such contracts provide ample time for both administrative and judicial review. Indeed, the present petition did not evade review; Petitioners themselves chose to abandon the undertakings that gave rise to the controversy. If further proof is needed that such contracts do not fall within that exception to the mootness rule, the petition of Nevada Power, which remains an active controversy before us, clearly establishes that an IA need not evade review.

Southern and Entergy claim that they are nonetheless before the court with a justiciable controversy because they are asserting facial challenges to the ongoing policy as well as seeking review of their underlying contracts. This argument also fails to keep them in court. While it is true that a petitioner with a mooted individual controversy may at times have standing to challenge an ongoing policy, such a petitioner must demonstrate standing to obtain each type of relief sought. *See City of Houston v. HUD*, 24 F.3d 1421, 1429 (D.C. Cir. 1994). Even if we assume that Entergy and Southern have properly raised a challenge to Commission policies beyond the specific orders for which they have sought review, they have not demonstrated that they have standing to challenge such ongoing policies.

To meet "the irreducible constitutional minimum for standing," petitioners must show, *inter alia*, that they suffer an actual injury in fact which is caused by the Commission's policy. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Commission's "At or Beyond" rule challenged by Petitioners does not affect Entergy or Southern until they are confronted with it in a matter before the Commission regarding

a "live" interconnection agreement. Until then, they are in a position identical to that of any other utility company whose hypothetical future interconnection agreements may be evaluated according to the rule. To open the courthouse doors to Entergy and Southern for the purposes of their policy challenge disembodied from the original Commission orders would open the door to every other utility company's challenges to Commission policies. Federal courts do not have the jurisdiction to render advisory opinions on such matters, with respect to FERC or any other administrative agency.

Entergy and Southern lack standing to proceed before this Court. This Court therefore lacks jurisdiction over the Entergy and Southern petitions.[1] Their cases are dismissed.

## B. *Limitation of Issues*

The elimination of the Entergy and Southern cases limits the matters remaining for this Court's consideration. This Court's power to review FERC petitions is tightly circumscribed: "No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for

---

[1]In reaching this conclusion, we do not ignore *Capitol Technical Servs, Inc. v. FAA*, 791 F.2d 964, 967 (D.C. Cir. 1986), cited by the separate opinion of our colleague. Rather, we simply do not read that case, or any other, as suggesting that standing need not be established for a general challenge when such general challenge is all that is left in the case. True, we did not in *Capitol Technical Services* address the question of standing, but it seems that standing to challenge the general policy in that case was clear enough. As the *Capitol Technical Services* panel explained in analyzing ripeness, "the hardship to Capitol is concrete and easily perceived; noncompliant foreign aircraft cannot reasonably expect to contract with Capitol for major maintenance at locations they cannot reach." *Id.* at 969.

rehearing unless there is reasonable ground for failure so to do." 16 U.S.C. § 825*l*(b) (2004). "Parties seeking review of FERC orders must petition for rehearing of those orders and must *themselves* raise in that petition *all* of the objections urged on appeal." *Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC*, 876 F.2d 109, 113 (D.C. Cir. 1989) (emphasis in original).

We construe § 825*l* narrowly. In *Kelley ex rel. Mich. Dep't of Nat'l Resources v. FERC*, we held that objections not explicitly presented in proceedings below, but arguably "implicit" in other objections, were not properly preserved: "Suffice to say that an argument 'implicit' in prior requests before the Commission's staff does not satisfy the strict standard of § 313(b) [of the Federal Power Act, codified at 16 U.S.C. § 825*l*]." 96 F.3d 1482, 1488 (D.C. Cir. 1996).

While § 825*l* offers petitioners an exception–i.e., a "reasonable ground for failure" to urge the objection below–Nevada Power offers no such reasonable ground for its failure to raise several objections in its petition for FERC rehearing. Therefore, any objections raised by Petitioners' consolidated briefs but not raised by Nevada Power in its administrative proceedings are not properly before this Court.

The only issues raised by Nevada Power in its petition for rehearing and preserved in Petitioners' consolidated briefs are whether: (1) the Commission's determination that the facilities at issue benefit the entire network was not supported by substantial evidence, and (2) the Commission's "At or Beyond" rule represents an unjustified departure from past precedent. Request for Rehearing at 6-12, *Nevada Power Co.*, Docket No. ER02-1913-001 (Aug. 16, 2002). A different version of these arguments advanced by Entergy or Southern that was not advanced by Nevada Power–e.g., that the Commission ignored

evidence that the facilities in question actually *decrease* network stability–is not properly before this Court in our consideration of Nevada Power's case. Such an argument was not even implicit–let alone explicit–in Nevada Power's objections before the Commission. Indeed, the evidence allegedly ignored by the Commission–a sworn affidavit–was introduced in Southern's proceedings, not Nevada Power's.

## C. *Substantial Evidence*

Nevada Power argues that the Commission's finding that facilities located "at or beyond" the point of interconnection to the network benefit the entire network was not supported by substantial evidence. *See* 5 U.S.C. § 706(2)(E) (2004) ("The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence . . . ."). It argues that GenWest was the sole beneficiary of the facilities at issue, and that geographic location of the additions to the Harry Allen Switchyard is not itself sufficient justification for a finding to the contrary.

But Nevada Power's view of "benefit" is too narrow. Like the petitioners in another recent challenge to the Commission's policy, this Petitioner suffers from a "cramped view of what constitutes a 'benefit.'" *Entergy Services, Inc. v. FERC*, 319 F.3d 536, 543 (D.C. Cir. 2003) ("*Entergy I*"). Nevada Power focuses on the benefit of "reliability" (or "stability"), which we recognized in *Entergy I*, *id.* at 544. *See* Brief for Petitioners at 30. So does Nevada Power's expert. Answer of Nevada Power Co. at Ex. A (Whalen Aff. at 2), *Nevada Power Co.*, Docket No. ER02-1913-000 (July 3, 2002). But "stability" is not the only "benefit" recognized by the Commission: the Commission cites the new facilities' contribution to the Switchyard's "expanded energy flow." Brief for Respondent at 48. Indeed, the Whalen affidavit recognizes

that, but for the added facilities, GenWest could not contribute its energy flow to the network. *Id.* This Court has recognized that system expansion is a "benefit" sufficient to support the Commission's pricing policy, *Entergy I*, 319 F.3d at 544, and we repeat that recognition here today.

The justifications that this Court accepted for the Commission's application of the pre-existing cost allocation policy to those specific facilities also warrant this Court's approval of the policies' application to the facilities here. As we noted, "[o]ur conclusion that the Commission has adequately set forth its rationale rests . . . on its explanation in the *Consumers Energy* decisions that the Commission relied upon in the order to review." *Id.* at 543.

The *Consumers Energy* explanation was the Commission's justification of "a standard policy that requires credits *for customer-funded network upgrades*," *Consumers Energy Co.*, 96 F.E.R.C. ¶ 61,132 at 61,560 (2001) ("*Consumers Energy II*") (emphasis added), *quoted in Entergy I*, 319 F.3d at 543, not just *for certain types* of customer-funded network upgrades. Petitioner contends that the facilities before us are not network upgrades. However, *Consumers Energy* resolves the question by its reference to the Commission's May 17, 2001 order. The Commission defined "network upgrades" by the point of connection of facilities, without a case-specific analysis of marginal benefit to other users:

> The Commission's policy regarding credits for network upgrades associated with the interconnection of a generating facility has been, and continues to be, that all *network upgrade* costs (the cost of *all facilities*

> *from the point where the generator connects to the grid*), including those necessary to remedy short-circuit and stability problems, should be credited back to the customer that funded the upgrades once delivery service begins.

*Consumers Energy Co*., 95 F.E.R.C. ¶ 61,233 at 61,804 (2001) ("*Consumers Energy I*") (emphasis added). In short, the Commission's definition of "network upgrade," accepted by *Entergy I*, includes any changes to facilities located on the grid. The *Consumers Energy I* justification, quoted above and in *Entergy I*, set forth an overarching defense of at least a "From" test: "all facilities *from* the point where the generator connects to the grid." *Id.* (emphasis added).

Petitioners urge us to read *Entergy I* narrowly, restricting it to the facilities at issue in that case: short-circuit and stability network upgrades. 319 F.3d at 544. But to adopt such a narrow reading would be to adopt a "cramped" view of *Entergy I*'s "less cramped view." *Id.* at 543. *Entergy I* does not endorse the Commission's policy merely with respect to short circuit and stability network upgrades. As this Court said in that case, such a limited holding was a mere "consequen[ce]" of the much larger holding: that the Commission had reasonably explained its crediting pricing policy *generally*. *Id.* That pricing policy, spelled out in *Consumers Energy*, makes no mention of specific reference to short circuit and stability network upgrades. It referred to "*all* facilities from the point" of interconnection. *Consumers Energy I*, 95 F.E.R.C. at 61,804 (emphasis added).

## D. *Departure from Precedent*

The only difficulty–and though it is a small one, it is one upon which potentially millions of dollars of cost allocation rest–is whether "from" as a test of allocation justified by the Commission in *Consumers Energy I* equates to "at or beyond" as the Commission urges in the present controversy, or merely to "beyond." Either is a natural reading of "from." For example, when a bridal couple declares their fealty "from this day forward," we would not likely interpret this as a declaration of faithfulness to begin the next day. The Commission's "at or beyond" test is consistent with such an immediate beginning inclusive of everything from the point of commencement including that point. On the other hand, if a travel guide tells us that it is "one hundred miles from City A to City B," we would not necessarily assume that any distance within the city of commencement is included within that one hundred miles. Neither construction would be unreasonable. Normally, we would defer to the Commission's interpretation of its own prior ruling. *Cassell v. FCC*, 154 F.3d 478, 483 (D.C. Cir. 1998). However, such deference would presuppose that the Commission had justified the subsequent usage in the prior declaration it purports to interpret. Such justification is not present on the record before us.

As we noted above, FERC's explanation of its policy application to the present contract depends upon its adoption of its rationale from the *Consumers Energy* decisions. As we further discussed above, justification by adoption of a prior ruling is perfectly appropriate and adequate. The difficulty is that the Commission's explanation in *Consumers Energy*, at least on its face, is not consistent with the Commission's application of the test to the facts before us. Nevada Power's petition does not depend on any inherent flaw in the "from" test as applied to improvements beyond the point of interconnection,

but only as to those precisely "at" the interconnection. It appears from the face of *Consumers Energy II* that the Commission's application of its test to the facts before it in that case may have been consistent with Nevada Power's interpretation rather than the one FERC advances now. The total interconnection cost at issue in *Consumers Energy* was $13.2 million. Of that total, the Commission permitted (albeit almost *sub silentio*) direct assignment of the "$3 million . . . attributable to the physical interconnection of the generating facility with consumers' transmission grid," and approved credit for the "remaining $10.2 million in network upgrade costs . . . ." *Consumers Energy I*, 95 F.E.R.C. at 61,082. If the Commission had intended "from" to mean "at or beyond" rather than simply "beyond," then it is not at all clear what accounts for the $3 million in direct assignment, as the interconnection presumably is "at" the determinative point. We therefore must vacate the order under review and remand the controversy to the Commission for further proceedings.

The progression of Commission pronouncements of its network upgrade policy demonstrates that the "At or Beyond" test is the product of regulatory evolution – marked by change, not consistency–beginning with *Consumers Energy*. The Commission issued *Consumers Energy I* on May 17, 2001. There it described "all network costs" as "the cost of all facilities *from* the point where the generator connects to the grid." 95 F.E.R.C. at 61,804 (emphasis added). As we noted, *supra*, in that analysis the Commission did not consider "the physical interconnection of the generating facility with . . . the grid" to be a "network upgrade." *Consumers Energy I* itself was a clarification, *see Entergy I*, 319 F.3d at 541, of a prior order in which the Commission excluded from "system upgrades" "the cost of minimum facilities needed to establish the interconnection." *Amer. Elec. Power Service Corp.*, 91 F.E.R.C. ¶ 61,308, at 62,051 (2000) ("*AEP"*), *quoted in Consumers*

*Energy II*, 96 F.E.R.C. at 61,559.

Less than one month after the issuance of *Consumers Energy I*, Commissioner Wood called for a change in policy. He proposed that "costs of transmission beyond the power plant busbar which are needed to accommodate the output of the new generation facility should be borne by the transmission service provider . . . ." *Detroit Edison Co*., 95 F.E.R.C. ¶ 61,415 at 62,540 (2001). Commissioner Wood credited his "recent experience" on Texas's regulatory body with demonstrating the need for interconnection cost-allocation policies that foster fair, efficient competition between old and new generators. *Id.* While this may appear to be a restatement, not change, of policy in light of *Consumers Energy I*, the concurrence's further explanation reveals a difference. Looking back to Commissioner Wood's experience, we see that the policies of the Public Utility Commission of Texas reflected an "At or Beyond" test rather than a "From" test. In at least one case the Texas Commission, in a decision authored by then-Commissioner Wood, included as "transmission costs" "the transmission switching facilities, necessary to provide the interconnection between [Generator] and [Transmission Service Provider]." *Petition of Pasadena Cogeneration, L.P. for Declaratory Order*, Docket No. 20,760, Public Util. Comm. of Texas, at ¶¶ I.15-18, III.1-2, 1999 Tex. PUC LEXIS 32 (Aug. 2, 1999). Commissioner Wood's discussion of the role of efficient cost-allocation in generator competition in *Detroit Edison* mirrors his discussion in *Pasadena Cogeneration*. Given the facts in *Pasadena Cogeneration*, he clearly endorsed an "At or Beyond" test in 1999. He appears to have called for a similar test in his 2001 *Detroit Edison* concurrence.

One month after Commissioner Wood's statement in *Detroit Edison*, the Commission denied a rehearing in *Consumers Energy*, and it made no reference to either a "From"

test or an "At or Beyond" test, but it referred only to network "upgrade" costs.  *Consumers Energy II*, 96 F.E.R.C. at 61,561.

The day after *Consumers Energy II*, however, the Commission stated its policy in a manner resembling an "At or Beyond Test" more than a "From" test of the sort suggested in *Consumers Energy I*, as it described the difference between a direct-assignment "interconnection facility" and a "network upgrade."  As the Commission noted:  "Interconnection facility costs are those costs associated with facilities *on the generator's side of the interconnection* with the grid, which traditionally have been directly assigned to the generator. Network upgrade costs are any upgrades necessary to grid facilities to allow the generator to inject its power *at the interconnection*."  *Removing Obstacles to Increased Electric Generation And Natural Gas Supply In The Western United States*, 96 F.E.R.C. ¶ 61,155, at 61,674 (2001) (emphasis added).  *Removing Obstacles* cited *Consumers Energy I* as a proper statement of its network upgrade cost-allocation policies, *id.* at 61,674 n.37, but did not explain why *Consumers Energy I* did not consider "the physical interconnection of the generating facility with . . . the grid" to be a "network upgrade," 95 F.E.R.C. at 61,802.  Nor did it explain why *Consumers Energy II* did not consider *AEP*'s "minimum facilities needed to establish the interconnection" to be "system upgrades."

In the three years following *Removing Obstacles* and *Consumers Energy*, the Commission has reiterated that its "At or Beyond" test was born not in *Removing Obstacles* but in *Consumers Energy I* and *II*.  In the administrative proceedings regarding Entergy's petition now before this Court, the Commission equated *Consumers Energy*'s "from the point [of interconnection]" language with an "At or Beyond" rule.  Order Denying Rehearing, *Entergy Gulf States, Inc.*, 99 F.E.R.C. ¶ 61,095, at 61,399 (2002) ("Entergy makes much of the fact that

we referred to network facilities as all those 'from' the point where the customer connects to the grid in *Consumers*, while referring to them, for the first time, as facilities 'at or beyond' that point in *Entergy*. . . . [W]e fail to see a meaningful distinction between these phrases . . . ."). The Commission has continued to maintain this position in its hearings on Southern's more recent IAs. *Southern Co. Servs.*, 108 F.E.R.C. ¶ 61,220 at 62,226 (2004); *Southern Co. Servs.*, 108 F.E.R.C. ¶ 61,229 at 62,249 (2004). In *Tampa Electric Co.*, the Commission traced the lineage of the "At or Beyond" test at as far back as *Consumers Energy*, and perhaps as far back as 1992's *Pub. Service Co. of Colorado.* 99 F.E.R.C. ¶ 61,192 at 61,795 (2002) (citing 59 F.E.R.C. ¶ 61,311 at 62,149 (1992)). The Commission repeated this genealogical claim in its denial of rehearing in *Nevada Power*. 101 F.E.R.C. ¶ 61,036 at 61,145 (2002). But in none of these cases did the Commission take account of *Consumers Energy I* and *II*'s discussion of facilities *at* the point of "interconnection."

Reading these cases, recounting the Commission's development of a "From" test, tracing its transformation into an "At or Beyond" test, and keeping in mind the Commission's subsequent assertions that the two tests are one and the same, we are left with the conclusion that the "At or Beyond" test represents an apparent departure from *Consumers Energy*'s "From" test. That departure may be slight, but it is a departure nonetheless.

We do not suggest that the Commission may not directly assign the costs at issue–as is apparent from our discussion in Part C, the same substantial evidence appears to support either test. But if the Commission does so, it must provide further explanation. The Commission may change its practices, but it must do so with "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually

ignored." *Entergy I*, 319 F.3d at 541. Departures from precedent must not violate the Administrative Procedure Act's prohibition on arbitrary and capricious decisionmaking. 5 U.S.C. § 706(2)(A); *TransCanada Pipelines Ltd. v. FERC*, 24 F.3d 305, 308 (D.C. Cir. 1994).

Although an agency's interpretation of its own precedent is entitled to deference, *Cassell v. FCC*, 154 F.3d 478, 483 (D.C. Cir. 1998), this Court cannot accept the Commission's assertion that "it has not now nor has it ever directly assigned the costs of the network at its borders." Brief for Respondent at 44. We will therefore allow the petition of Nevada Power and remand this case to the Commission for further explanation. That explanation may take the form of a clarification of *Consumers Energy I* that in some way establishes that we have misread the Commission's apparent direct assignment of costs occurring precisely at the point of interconnection or an explanation of why it has departed from that policy. It must do one or the other if we are to sustain the result reached in the order on review.

## Conclusion

For the reasons set forth above, we conclude that the petitions of Southern and Entergy must be dismissed. However, as to the order from which Nevada Power petitions for review, we order that it be vacated and the case remanded to the Commission for further proceedings consistent with this opinion.

*So ordered.*

TATEL, *Circuit Judge*, concurring in part and concurring in the judgment: I agree with the court on the merits and join Parts I and II.B-D of its opinion. I also agree that we lack jurisdiction over the Entergy and Southern petitions, but I cannot join Part II.A because, in my view, the court's approach "incorrectly conflate[s] our case law on initial standing to bring suit with our case law on postcommencement mootness," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 174 (2000) (citations omitted).

Two of the three petitions fail—unarguably, in my view—on standing grounds alone. Entergy filed its petition for review on June 24, 2002, ten days *after* FERC accepted the company's proposed termination of its Interconnection Agreement ("IA") with Amelia Energy Center. Southern filed its second petition for review on February 13, 2003, more than a month *after* the effective cancellation of its IA with Athens Development. Since neither IA remained in effect at the time the companies sought judicial review, precedent requires that we address jurisdiction as a question of standing, not mootness.

In *Advanced Management Technology, Inc. v. FAA*, 211 F.3d 633 (D.C. Cir. 2000), we had to decide whether standing or mootness doctrine applied in a situation where the petitioner filed its challenge to the agency's termination of a contract *after* the agency had re-awarded the contract to petitioner. "The claim may sound like one of mootness—a justiciable controversy existed but no longer remains—but the timing makes [petitioner's] problem one of standing. . . . Standing is assessed 'at the time the action commences,' i.e., in this case, at the time [petitioner] sought relief from an Article III court." *Id.* at 636 (quoting *Laidlaw Envtl. Servs.*, 528 U.S. at 191) (internal citation omitted); *see also WorldCom, Inc. v. FCC,* 308 F.3d 1, 10 (D.C. Cir. 2002) (where petitioner lacked standing at the onset of its suit because the issue had lost "practical significance," it could not argue that its situation was "capable of repetition yet evading review" since "that familiar exception

to mootness cannot confer standing on a claim when injury in fact was missing at the outset") (internal quotation marks omitted); *City of Orrville v. FERC*, 147 F.3d 979, 985 n.5 (D.C. Cir. 1998) ("Because [petitioner's] preliminary permit expired before it petitioned for review, . . . its claims are properly disposed of on standing, rather than mootness, grounds."). The court cites *Northwest Pipeline Corp. v. FERC*, 863 F.2d 73, 76 (D.C. Cir. 1988), but in that case we applied a mootness analysis because petitioner filed for review in 1987 (as the docket number makes clear) well *before* "the challenged rate terms disappeared into the regulatory netherworld" in June 1988. *See id.*

Given this case law, I believe this court had no reason to consider whether mootness exceptions apply to the Entergy and second Southern petitions, as the two companies lacked standing in the first place. Once their IAs had terminated, neither qualified as a party "aggrieved by an order issued by the Commission" within the meaning of section 313(b) of the Federal Power Act, 16 U.S.C. § 825*l*(b). "The requirement of aggrievement serves to distinguish a person with a direct stake in the outcome of a litigation from a person with a mere interest in the problem." *City of Orrville*, 147 F.3d at 985 (quoting *North Carolina Utils. Comm'n v. FERC*, 653 F.2d 655, 662 (D.C. Cir. 1981)). After their IAs terminated, Entergy and Southern had only a "mere interest." They thus lack standing to petition for review in this court.

Southern's first petition for review presents a different, more complex situation. Southern filed that petition on November 1, 2002, almost three months *before* FERC accepted the termination of the company's IA with Blount County Energy. "[A]t the time the action commence[d]," *Laidlaw Envtl. Servs.*, 528 U.S. at 191, Southern therefore had standing to challenge FERC's modification of the company's IA, as well as

the policies on which that order rested. With the cancellation of the IA, Southern's specific challenge became moot, and (as the court notes) neither the "voluntary cessation" nor the "capable of repetition yet evading review" exception applies.

We thus need to determine whether a justiciable controversy remains due to Southern's broader reason for objecting to the challenged order—namely, the company's claim that the policies underlying that order require it to revise other IAs, revisions that will cost it some $22 million. This court faced a similar issue in *Capitol Technical Services, Inc. v. FAA*, 791 F.2d 964, 967 (D.C. Cir. 1986), where petitioner, maintenance provider for foreign aircraft, sought an exemption from an FAA noise-control regulation so that it could fly two DC-8s to the United States for servicing. By the time we heard the petition, however, the time for servicing the two airplanes had passed. *Id.* at 965-66. We held that although petitioner's challenge to the FAA's denial of an exemption for the specific planes had become moot, the "challenge to th[e] general policy is not moot" because "[c]learly Capitol sought not only a particular exemption, but also a decision favorable to the continued viability of its business." *Id.* at 968; *see also City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1428-1430 (D.C. Cir. 1994); *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 90-92 (D.C. Cir. 1986). Significantly, we did not reevaluate whether Capitol had standing to petition for review on policy grounds. Had we done so under the court's logic today, we would have concluded that Capitol lacked standing to pursue its policy challenge, since Capitol was in a "position identical to that of any other [maintenance provider] whose hypothetical future [requests for foreign aircraft exemptions] may be evaluated according to the rule," *see* majority slip op. at 9-10. Instead, we applied mootness doctrine to evaluate the justiciability of Capitol's policy challenge and found "plainly meritless" the agency's argument that "[i]f Capitol wishes to

obtain exemptions for future flights by noncompliant foreign operators to its maintenance facilities . . . it should reapply for exemptions and, if unsatisfied, seek review of those decisions." 791 F.2d at 989. Concluding that Capitol's policy concerns remained alive, we went on to find its challenge ripe because the FAA's policy was fit for review and Capitol would suffer hardship without immediate review. 791 F.2d at 969 & n.26 (applying the ripeness test developed in *Abbot Laboratories v. Gardner*, 387 U.S. 136 (1967)). As to fitness, we observed that the issues were "purely legal . . . [and] there can be no question that the agency action has taken final form; indeed, the agency has not even suggested that any further policy evolution could be expected." *Id.*

Disregarding *Capitol Technical Services*, the court today holds that once a petitioner's specific challenge has become moot, we must go back and reevaluate the petitioner's standing. In support, the court relies on *City of Houston*, 24 F.3d at 1429-30 & n.6, which stands for the proposition, established since at least *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), that plaintiffs in civil suits must establish standing separately for each type of relief they seek—declaratory relief, injunctive relief, damages, etc. By contrast, like the petitioner in *Capitol Technical Services*, Southern has filed a petition for review of an agency action and seeks the same relief on both specific and policy grounds: vacatur of FERC's order based on a finding that the order was arbitrary and capricious. At the time Southern petitioned for review, it plainly had standing to seek this relief, and under *Capitol Technical Services* our jurisdiction over Southern's policy challenge should turn on whether that challenge has also become moot or, alternatively, whether it is unripe for review.

As to mootness, we have typically applied the policy-challenge exception to mootness in situations where the specific

requests became moot due to circumstances beyond petitioners' control. *See Capitol Technical Servs., Inc.,* 791 F.2d at 967-68; *City of Houston*, 24 F.3d at 1424, 1428-29; *Better Gov't Ass'n*, 780 F.2d at 88, 90-92. But Southern's specific request became moot due to its voluntary decision to seek cancellation of its IA. I am thus unsure whether Southern's policy challenge remains alive. In any event, I am convinced the challenge is unripe.

To begin with, this case differs from *Capitol Technical Services* in a significant respect. There, the FAA "ha[d] not even suggested that any further policy evolution could be expected." 791 F.2d at 969. At the time of Southern's challenge, by contrast, FERC's policy had not yet become final. Indeed, in later rulemaking orders, FERC revisited its "At or Beyond Test" (and particularly its explanations for the test). *See Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, [Regs. Preambles] FERC Stats. & Regs. ¶ 31,146, 68 Fed. Reg. 49,846 (2003); *on reh'g,* Order No. 2003-A, [Regs. Preambles] FERC Stats. & Regs. ¶ 31,160, 69 Fed. Reg. 15,932 (2004). Absent a specific need for relief, it seems unfair to require FERC to defend its earlier, less complete explanation of its policy. Moreover, the "only hardship" Southern "will endure as a result of delaying consideration of this issue is the burden of having to file another suit." *See Webb v. Dep't of Health & Human Servs.*, 696 F.2d 101, 107 (D.C. Cir. 1982). Because this relatively minimal hardship does not outweigh the relatively strong interest in postponing judicial review, I would find Southern's policy challenge unripe.

Over a quarter century ago, Justice Brennan warned that "Art. III jurisprudence . . . in such areas as mootness and standing is creating an obstacle course of confusing standardless rules to be fathomed by courts and litigants." *Kremens v. Bartley*, 431 U.S. 119, 140 (1977) (Brennan, J., dissenting). The opinion in this case may add still more obstacles to the already

littered course. Until today, where a petitioner sought review *after* the challenged order had ceased to aggrieve it, as with two of the petitions in this case, we evaluated the case under standing doctrine alone. Yet the court today addresses mootness even though "if a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum." *See Laidlaw Envtl. Servs.*, 528 U.S. at 191. Moreover, we have no reason to reevaluate a petitioner's standing during the course of a proceeding, as we retain authority to weed out those cases that cease to present justiciable controversies by using the doctrines designed for that purpose—mootness and ripeness. The court's midstream assessment of standing muddies this sensible framework. True, standing and mootness are closely related, but they are cousins, not twins.